The plaintiff appeals from a summary judgment entered in favor of the defendant, UAB Research Foundation ("UABRF"), on claims arising out of an alleged breach of a partnership agreement between UABRF and the plaintiff, Mims, Lyemance, 
Reich, Inc. ("MLR). We affirm.
The issues are: 1) whether the trial court erred in holding, as a matter of law, that no partnership existed because the partnership agreement was an executory agreement; 2) whether the trial court erred in concluding that there had been no breach of the confidentiality agreement between MLR and UABRF; 3) whether there was sufficient evidence to support MLR's claim of fraud and misrepresentation by UABRF; and 4) whether there was sufficient evidence to support MLR's quantum meruit claim for reimbursement for services it rendered under the partnership agreement.
 Facts
Because a statement of the facts of this case is essential to an understanding of the issues, we will set forth the facts, as revealed by the record, in detail. In 1988, *Page 596 
representatives of MLR met with representatives of the University of Alabama at Birmingham ("UAB") to explore the concept of developing a geriatric-retirement research center ("the project"). A "working group" of MLR and UAB employees examined the concept, and a confidentiality agreement between UABRF and MLR was signed on February 27, 1989. Those parts of the confidentiality agreement pertinent to this appeal state:
 "The UAB Research Foundation and [MLR] hereby establish a confidentiality agreement for the purpose of protecting unto each other the information exchanged and/or developed in the course of exploring, evaluating the feasibility, and developing a facility or facilities (the 'Project') for older adults. . . .
". . . .
 "The purpose of this Confidentiality Agreement is to document the existence of a confidential and exclusive relationship between UAB RF and MLR for this Project which is conceived as a mutual creative effort without which the Project would not be possible.
 "Information subject to this agreement is intended to include the existence of the business arrangement and all results of the mutual effort including but not limited to studies, memoranda, notes, design documents, plans, and specifications, and any and all other information created in or as the result of meetings, planning sessions, or individual efforts by either or both Parties. Subject information is to be held in the strictest confidence by UAB RF and MLR and their employees and representatives. Neither Party shall disclose the content of the information without the specific written consent of the other Party.
 "Information not subject to this agreement shall include information already known to UAB RF, information publicly available, information acquired or developed after the termination of this agreement, and information acquired from third parties under no obligation to conform to the terms of this agreement.
". . . .
 "A mutually acceptable and agreeable form of entity (the 'Entity'), e.g. partnership, joint venture, or other to be identified, will be created between UAB RF and MLR to define, create, and develop the Project. . . .
". . . .
 "This Agreement shall extend for a term of 24 months beginning on the date of this Agreement, but may be extended for additional terms of one year upon the mutual agreement of the Parties. However, this Agreement shall be automatically terminated at any time upon (a) the creation of the Entity or (b) a determination by both Parties that the Project is not feasible or desirable (which determination shall not be unreasonably withheld by either Party)."
At a meeting on May 30, 1989, between MLR and senior UAB officials, the parties determined that if the financial and market feasibility studies on the project proved positive, then it would be desirable to pursue the evolving partnership between UABRF and MLR. UAB subsequently hired Crown Research Corporation to perform the feasibility analysis.
On July 25, 1989, MLR and UABRF signed an agreement to form a general partnership. Because the trial court's interpretation of this "Partnership Agreement" was critical to its entry of summary judgment, we set it forth in its entirety:
"July 25, 1989
 "UAB Research Foundation "Birmingham, AL "RE: The University Group, an Alabama General Partnership
"Gentlemen:
 "This will confirm our agreement to form a general partnership under the laws of the State of Alabama under the name of The University Group, a general partnership (the 'Partnership'). The initial partners of the Partnership are UAB Research Foundation and Mims, Lyemance and Reich, Inc. (the 'Partners'). The partnership may admit additional partners upon such terms as may be unanimously agreed upon by the Partners. *Page 597 
 "The Partnership is organized for the purpose of exploring and evaluating the feasibility of the facility or facilities (the 'Project') for older adults as contemplated under the terms and conditions of the Confidentiality Agreement between UAB Research Foundation and [MLR] (the 'Confidentiality Agreement'). The Partnership shall undertake to complete a feasibility study for the Project on or before September 30, 1989. Upon completion of the feasibility study for the Project, the Partnership shall elect, with the consent of the Partners, to either (i) develop the Project on such terms as shall be mutually acceptable to the Partners; or (ii) abandon the Project and terminate the Partnership.
 "The Partners shall not be required to make any capital contribution to the Partnership on its formation. The Partners may agree to contribute funds to the Partnership in such amounts and at such times as may be mutually agreed upon by the Partners.
 "The Partners' interests in the Partnership shall be divided equally between the Partners: 50% to UAB Research Foundation and 50% to Mims, Lyemance and Reich, Inc. All distributions from the Partnership shall be made in accordance with such percentage interest.
 "The Partners shall be jointly responsible for the management of the business of the Partnership. Decisions with respect to Partnership business will require consent of both Partners. All Partners shall be required to execute obligations that are binding upon the Partnership.
 "Except as otherwise provided herein, the Partners agree that their relationship with each other and with creditors and other persons doing business with the Partnership shall be governed by the Alabama Partnership Act [Section 10-8-1 et seq., Code of Alabama 1975].
 "The UAB Research Foundation agrees that Mims, Lyemance and Reich, Inc. has succeeded to the interest of Messrs. Mims, Lyemance [and] Reich in and to the Confidentiality Agreement, and the Partners agree to be bound by the terms and conditions of said Confidentiality Agreement. The formation of the Partnership shall not cause the termination of the Confidentiality Agreement notwithstanding the provision in the Confidentiality Agreement which provides that the formation of the Entity shall cause its termination. In the event the Partnership elects to develop the Project, the Partners will engage legal counsel to prepare an amended restated partnership agreement which will more clearly define our relationship as Partners in connection with the development of the Project. The execution of such amended and restated Partnership Agreement shall be deemed to constitute the 'formation of the Entity' under the terms of the Confidentiality Agreement.
 "If the foregoing statement meets with your understanding, please indicate your acceptance in the space provided below.
"Very Truly Yours,
"MIMS, LYEMANCE REICH, INC.
"By: /s/ Robert D. Reich, Jr.
"Its: __________
 "Agreed to and accepted on this "25th day of July, 1989. "UAB RESEARCH FOUNDATION "By: /s/ Charles A. McCallum
"Its: President"
On November 1, 1989, the working group members of UABRF and MLR presented a progress report to senior UAB officials; that report indicated that the project was feasible at that time. This presentation was based, in part, on the market analysis and the economic feasibility study compiled by Crown Research. Although the project was received favorably by university officials, Dr. Charles A. McCallum, the president of UAB, indicated that further exploration into several areas was needed before a final decision on the project was possible.
The record shows that continued meetings and preparation of economic models reflected positively on the project's market feasibility, although there were some unanswered questions about its financial feasibility. Dr. McCallum and the UAB treasurer, *Page 598 
Linda Flaherty-Goldsmith, contacted Joan Annett, a representative of Smith Barney, for further consultation. Smith Barney was a potential underwriter of the bond issues that would be necessary for the funding of development and construction of the project. Annett initially indicated that the project seemed feasible, and she provided a list of tasks in further evaluation of the project that she believed should be completed before any final commitment to the project should be made.
Dr. McCallum and Flaherty-Goldsmith travelled to Boston in April 1990, to explore further financing of the project with representatives of Smith Barney. These representatives indicated that tax-exempt financing, which was crucial to the feasibility of the project, could not be obtained if MLR — as a for-profit entity — was involved as a partial owner of the project. Although they felt that MLR could remain involved as a developer or manager of the project, the Smith Barney representatives had questions about whether MLR had the expertise necessary to be the lead developer of the project.
At a meeting on May 10, 1990, Dr. Kenneth Roozen, the executive director of UABRF, informed MLR that the university was ready to begin the purchase of land for the project. Throughout the summer of 1990, MLR continued to work on draft proposals for a partnership agreement concerning the development of the geriatric research center. In September 1990, experienced counsel expressed doubts to Dr. Roozen about the willingness of lenders to finance the project, given the higher-than-average development and termination fees proposed by MLR in its draft development agreement. On September 20, 1990, Dr. Roozen sent MLR a confidential letter informing it that UAB would have to complete land acquisition for the project before UAB or UABRF could "negotiate terms of specific development and management agreements."
On November 1, 1990, at a meeting of the UAB board of trustees, Flaherty-Goldsmith requested the board to approve contracts to purchase specific parcels of land within the site for the project. A frontpage article in the BirminghamPost-Herald newspaper on November 2, 1990, listed specific parcels of land and stated that Flaherty-Goldsmith had said that UAB was buying the property "for a retirement-geriatric research center," and that a project summary indicated that part of the area was "being considered for use as elderly housing, but if, after a market survey, it is determined not feasible, then the school will use the property for other purposes."
Representatives of UAB, UABRF, and MLR held a meeting in early November to examine continued participation in further evaluation of the project. In response to that meeting, Dr. Roozen, as executive director of UABRF, wrote Robert Reich of MLR on November 29, 1990. Roozen's letter informed MLR that UABRF did not consider it feasible or desirable to continue its participation in the geriatric project; that it wanted to dissolve the partnership created by the July 25, 1989, agreement; and that the parties should release each other from the confidentiality agreement dated February 27, 1989. Representatives of UABRF and MLR continued to discuss the feasibility of the project until February 6, 1991, when Dr. Roozen informed Reich that UABRF considered the partnership with MLR "dissolved due to the termination of the particular undertaking of the partnership." Roozen further informed Reich that UABRF considered the feasibility study to have been completed and that UABRF was abandoning the envisioned project.
On May 24, 1991, MLR sued UABRF for $50,000,000 in damages, based on claims arising out of an alleged breach of the confidentiality agreement; breach of the parties' partnership agreement; fraud and misrepresentation by UABRF; and breach of the obligation of good faith and fair dealing. MLR also sought to recover expenses and to recover the value of services rendered, under the theory of quantum meruit. UABRF moved for summary judgment against all claims. After conducting a hearing and considering both parties' briefs, exhibits, and depositions, the trial court on June 10, 1992, entered a final *Page 599 
summary judgment in favor of UABRF. MLR appeals.
A summary judgment is proper when there exists no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56, A.R.Civ.P.; King v.Breen, 560 So.2d 186 (Ala. 1990). In determining whether a summary judgment was properly entered, this Court will view the evidence in a light most favorable to the nonmovant and will resolve against the moving party all reasonable doubts concerning the existence of a genuine issue of material fact.Fincher v. Robinson Bros. Lincoln-Mercury, Inc., 583 So.2d 256
(Ala. 1991). In determining whether there was a genuine issue of material fact, this Court is limited to a consideration of the factors that were before the trial court when it ruled on the summary judgment motion. Broadmoor Realty, Inc. v. FirstNationwide Bank, 568 So.2d 779 (Ala. 1990). However, this Court's reasoning is not limited to that applied by the trial court. Hill v. Talladega College, 502 So.2d 735 (Ala. 1987).
Once the moving party makes a prima facie showing that no genuine issue of material fact exists, then the nonmoving party has the burden of presenting evidence demonstrating the existence of a genuine issue of material fact. Grider v.Grider, 555 So.2d 104 (Ala. 1989). Because this action was filed after June 11, 1987, the nonmovant must meet this burden by "substantial evidence." Alabama Code 1975, § 12-21-12; Bass v.SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98
(Ala. 1989). Under the substantial evidence test, the nonmovant must present "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989); § 12-21-12(d).
 I.
MLR alleged that UABRF breached the parties' partnership agreement by failing to go forward with the development of the geriatric center project. Because the trial court implicitly viewed this issue as dispositive of all the claims made by MLR, we shall address this issue first. The trial court's summary judgment described the July 25, 1989, partnership agreement as, "at best, an agreement to agree."
Careful review of the record indicates that there were, in fact, two separate partnerships under consideration. The first partnership, a "feasibility partnership," was created by the July 25, 1989, agreement "for the purpose of exploring and evaluating the feasibility of the [geriatric research] facility." The evidence shows that it was through this partnership that the parties examined the feasibility of the project and that it was pursuant to this partnership that UAB began to purchase land at the site of the proposed geriatric center.
A second partnership, a "development partnership" for the purpose of developing and constructing the project once it was found to be feasible, was expressly contemplated in the July 25 partnership agreement. The July 25 agreement indicates that this development partnership, if created, would be based on "an amended and restated Partnership Agreement," and would constitute the "formation of the Entity" under the terms of the confidentiality agreement. MLR's claims for damages arise out of the failure to develop the geriatric facility, and are, thus, based on the existence of this second partnership. However, there is no substantial evidence in the record that MLR and UABRF ever formed this second partnership to develop the project.
In Alabama, formation of a partnership rests on the intention of the parties, and the agreement to become partners "may be derived from the expressions of the parties or from the facts and circumstances surrounding their business relationships."Dutton v. Dutton, 446 So.2d 615, 617 (Ala.Civ.App. 1983). "There is no settled test for determining the existence of a partnership. That determination is made by reviewing all the attendant circumstances, including the right to manage and control the business." Vance v. Huff, *Page 600 568 So.2d 745, 748 (Ala. 1990) (citing Ala. Code 1975, § 10-8-20, and McCrary v. Butler, 540 So.2d 736 (Ala. 1989)).
The July 25 partnership agreement, by its terms, provides that MLR and UABRF were partners for the purpose of evaluating the feasibility of the project. The actions of the parties between the signing of this agreement and the end of 1990 support this conclusion.
The acts of the parties and all the attendant circumstances do not indicate, however, that UABRF and MLR ever formed a partnership to develop and build the geriatric center. The language of the July 25 agreement indicates that the parties intended, at some time in the future, to become partners for the development of the center. This language specifically stated that if MLR and UABRF elected to develop the project, then an "amended and restated partnership agreement which will more clearly define [their] relationship as Partners in connection with the development of the Project" would be prepared. We can find in the record no evidence that an amended and restated partnership agreement was ever created, nor is there any indication from the attendant circumstances that the parties acted in the manner necessary to establish such a partnership. Although UAB began to buy land near the tentative site for the geriatric center, the university stopped these land purchases pending the outcome of this action, and there is no evidence that UAB completed the purchase of all the land that would have been required for the project. No bonds were ever issued to finance the project, and no construction ever began. "The enterprise in which the parties were to engage must have been launched under the agreement before the parties became partners. 68 C.J.S. Partnership § 11, [p.] 419." Higginsv. Higgins, 266 Ala. 514, 518, 97 So.2d 812 (1957). Because development and construction of the geriatric research center never began, the partnership upon which MLR bases most of its claims in this suit never came into existence.
Because the July 25 agreement was an agreement to form a partnership for the purpose of developing the project, "[b]ut the essentials necessary to the real purpose of the partnership were never completed and its operation never begun,"Higgins, supra, at 518, 97 So.2d at 812, we hold that the trial court correctly concluded that the partnership agreement was an agreement to agree. Because the executory agreement was never consummated, there was no partnership agreement for the development of the project upon which to base a claim of breach; the trial court correctly entered the summary judgment as to the claim alleging breach of a partnership agreement.
 II.
MLR's claim for damages based on an alleged breach of the confidentiality agreement also depends on the existence of a partnership to develop the project. Because the trial court correctly determined that no such partnership had been created, the summary judgment was appropriate on the breach of confidentiality claim as well. MLR contends that any damage caused by the breach of confidentiality was due to the direct effect on the project's feasibility allegedly caused by the increase in the price of land at the project site that occurred around the time of Flaherty-Goldsmith's presentation to the board of directors in November 1990.[1] A careful review of the record reveals no substantial evidence to support MLR's claim that the project became unfeasible because of an increase in land prices.
 III.
MLR contends that the summary judgment was improper on its fraud claim because, it says, UABRF's intent to deceive "is a matter 'particularly within the province of the trier of facts.' " Super Valu Stores, Inc. v. Peterson, 506 So.2d 317,333 (Ala. 1987) (quoting Walker v. Woodall, 288 Ala. 510, 513,262 So.2d 756, 759 (1972)). However, when there is no substantial evidence *Page 601 
to support the claim of fraud or misrepresentation, a summary judgment is proper. Vance v. Huff, supra at 750. The alleged misrepresentations concern future acts. Therefore, in addition to proving the usual elements of fraudulent misrepresentation, § 6-5-101, MLR must also present substantial evidence that, at the time it made the alleged misrepresentations, UABRF did not intend to do the acts promised, and that the misrepresentations were made with the present intent to deceive MLR. Campisi v.Scoles Cadillac, Inc. 611 So.2d 296, 300 (Ala. 1992); Vance v.Huff, supra at 750.
MLR contends that UABRF knowingly or recklessly continued to represent to MLR that the project was economically feasible and that the project would be continued to its completion with MLR, and, therefore, MLR contends that UABRF fraudulently induced MLR to continue its efforts in evaluating the project. MLR further contends that UABRF withheld from MLR its decision to withdraw from the project while still allowing MLR to continue to work on it.
There is evidence that UABRF intended to examine the feasibility of the project and that it, in partnership with MLR, did examine the project's feasibility. Nothing in the record indicates that UABRF ever promised to develop the project until the parties had agreed that the project was feasible. In fact, once UABRF concluded that the project was not feasible, in late 1990, it tried to dissolve the partnership. After carefully reviewing the record, we can find no substantial evidence to support MLR's claim of fraud. Therefore, the summary judgment was proper as to that claim.
MLR also contends that UABRF intends to continue the project and to exclude MLR from its development, and, thus, that it acted in bad faith and breached the fiduciary duty owed between partners. See Ala. Code 1975, § 10-8-48; Cox v. F S,489 So.2d 516, 518 (Ala. 1986). There is no merit to this argument, because there was no partnership for the development of the project on which to base this contention. In fact, the record shows that UABRF attempted to dissolve its partnership with MLR because the purpose of the original partnership — to examine feasibility of the project — had been concluded and UABRF had determined that development of the project was not feasible. There is no substantial evidence that UABRF acted in bad faith in so doing. In fact, the confidentiality agreement expressly contemplated that the parties could determine that the project was not feasible or desirable, and that neither party should unreasonably withhold such a determination. Neither does any continued purchase of lots at the proposed project site establish an intent to deceive MLR. UAB's board of directors approved the purchase of lots with the understanding that the university would use the land for other purposes should the proposed geriatric project be abandoned before construction of the center began. Because we can find in the record no substantial evidence that UABRF acted in bad faith with intent to deceive MLR, or that, at this time, UABRF intends to continue the project, we affirm the summary judgment as to the issue of breach of fiduciary duty.
 IV.
Finally, MLR contends that the court erred in denying its claim under the theory of quantum meruit for 1) a recovery to compensate it for expenses it incurred and 2) the value of services rendered during the evaluation of the feasibility of the project. "[U]nder Ala. Code 1975, § 10-8-43(6), 'no partner is entitled to remuneration for acting in the partnership business.' " Vance v. Huff, supra at 752. Although "the partners may agree that a partner shall receive compensation, or such an agreement may be implied," Nash v. Vann,390 So.2d 301, 303 (Ala.Civ.App. 1980), we find no evidence of such an agreement, implicit or otherwise. Because these services were rendered pursuant to partnership business, there is no merit to this claim. As to the claim for compensation for expenses incurred, this matter should be determined during an accounting following dissolution of the partnership, see Cooper v. Cooper,289 Ala. 263, 266 So.2d 871, 881 (1972), and it is therefore not *Page 602 
properly before us. The trial court did not err in denying MLR's claim under the theory of quantum meruit.
The judgment of the trial court is affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, HOUSTON and KENNEDY, JJ., concur.
[1] Her statements were reported in the Birmingham Post-Herald
article indicating that UAB was buying specific lots for a retirement-geriatric research center.